IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 11, 2015 Session

**STATE OF TENNESSEE v. AARON D. OSTINE**

**Appeal from the Circuit Court for Cheatham County**
**No. 16307, 16705    Robert Burch, Judge**

_____

**No. M2013-00467-CCA-R3-CD – Filed November 12, 2015**

_____

A Cheatham County jury convicted the Defendant, Aaron D. Ostine, of first degree premeditated murder, first degree felony murder, and aggravated robbery. The trial court merged the two murder convictions and imposed a life sentence. The court then sentenced the Defendant to twelve years for the aggravated robbery conviction. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his convictions; (2) the trial court erred when it denied a motion to suppress his statements to police; and (3) the State engaged in prosecutorial misconduct during closing argument. After a thorough review of the record and the applicable law, this Court affirmed the trial court's judgment. *See State v. Aaron D. Ostine*, No. M2013-00467-CCA-R3-CD, 2014 WL 2442988 (Tenn. Crim. App., at Nashville, May 28, 2014). The Defendant filed a Rule 11 application, pursuant to the Tennessee Rules of Appellate Procedure, to the Tennessee Supreme Court. Our Supreme Court granted the application and remanded the case to this Court for reconsideration in light of *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014). After considering the facts and circumstances of this case as compared to those in *Jackson*, we again affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Michael J. Flanagan, Nashville, Tennessee, for the appellant, Aaron D. Ostine.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie Price, Senior Counsel; Dan M. Alsobrooks, District Attorney General; and Robert S. Wilson, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION
## I. Procedural Background

A Cheatham County jury convicted the Defendant of first degree premeditated murder, first degree felony murder perpetrated during a robbery, and aggravated robbery. The trial court merged the murder convictions and imposed a life sentence. The Defendant timely filed a motion for new trial which the trial denied on February 6, 2013. On February 11, 2013, the Defendant filed his notice of appeal asserting insufficient evidence, his statement to police should have been suppressed, and prosecutorial misconduct. On direct appeal, this Court affirmed the trial court in all respects. *Ostine,* 2014 WL 2442988, at *1.

On August 22, 2014, the Tennessee Supreme Court issued an opinion, *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014), that addressed the review of prosecutorial misconduct in the context of remarks about a defendant's decision to not testify. In the opinion, our Supreme Court clarified the law involving the varying standards of review applicable to different categories of error. The Court stated that the identification of the category of error, structural constitutional error, non-structural constitutional error and non-constitutional error, is "'more than academic' because the standard an appellate court uses to determine whether an error is harmless differs significantly depending on the type of error." *Id.* at 590 (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). In noting this Court's use of the five-factor test set forth in *Judge v. State* for improper prosecutorial argument in cases of unconstitutional prosecutorial comment, the *Jackson* Court limited the application of the *Judge* factors to claims of improper prosecutorial argument that do not rise to the level of a constitutional violation, abrogating *State v. James Michael Flinn*, No. E2009-00849-CCA-R3-CD, 2013 WL 6237253, at *73 (Tenn. Crim. App., at Knoxville, Dec. 3, 2013), *no Tenn. R. App. P. 11 application filed*, and *State v. Byron Becton*, No. W2011-02565-CCA-R3-CD, 2013 WL 967755, at *23 (Tenn. Crim. App., at Jackson, Mar. 11, 2013), *no Tenn. R. App. P. 11 application filed*. Thereafter, our Supreme Court remanded the Defendant's Rule 11 application to this Court for reconsideration in light of *Jackson*.

## II. Facts

This case arises from the robbery and murder of Robert L. Guye, Jr., in his home, on or about October 12, 2010. For the Defendant's role in these crimes, a Cheatham County grand jury indicted him for first degree premeditated murder, first degree felony murder, and aggravated robbery. A co-defendant, Montario D. Ostine, was also indicted for these crimes.

### A. Suppression Hearing

The Defendant filed a motion to suppress his statements made to police on the basis that the statements were involuntary. At the suppression hearing, the parties presented the following evidence: Jason Matlock, an Ashland City police detective, testified that he videotaped the March 17, 2011, interview with the Defendant that was played for the trial court. Detective Matlock explained that a U.S. Marshal had notified him that the Defendant was in custody and that the Marshal arranged to meet with Detective Matlock to transfer the custody of the Defendant to Detective Matlock.

Detective Matlock testified that, after the transfer of custody, he took the Defendant to the Ashland City Police Department for the interview. At the time, the detective had not discussed with the prosecutor whether to mention to the Defendant the possibility of the death penalty as a punishment for these crimes. He said that, prior to his interview with the Defendant, the only mention of the death penalty that he recalled was a prosecutor stating that the offenses "could carry the death penalty."

Detective Matlock testified that he told the Defendant that, if he were honest and remorseful, it would be "made known" to the prosecutor. Detective Matlock agreed that, during the interview, he allowed the Defendant to call his aunt. The telephone call was transmitted through a speaker phone, and Detective Matlock was present in the room. During the telephone conversation, the Defendant told his aunt that he was going to be away for awhile. When his aunt asked about the length of time, the Defendant told her fifty-one years, but his time might be shorter if he cooperated. Detective Matlock agreed that he did not correct the Defendant when he made this statement. Detective Matlock explained that he did not do so because the Defendant corrected himself by then saying, "there's no promises."

The Defendant testified that "[r]ight before" the U.S Marshals "picked [him] up," he had "smoked a blunt of some drug." The Defendant stated that he was "high" during the recorded interview with police. The Defendant said that he denied involvement in the crimes until the detective mentioned the death penalty. The Defendant said that the possibility of the death penalty caused him concern. He said that he believed that if he cooperated his sentence would be reduced and that the reduction was the only reason he provided a statement to the police.

On cross-examination, the Defendant agreed that the police allowed him to call his aunt[1] and were cooperative in helping him place the call. The Defendant agreed that it was not until after he spoke with his aunt that he confessed, but he denied that his aunt had

---

[1] The Defendant testified that the woman he called was "actually [his] cousin." He explained that she was "kind of [his] auntie too," because she had been "like a mother" to him since he was thirteen years old. For purposes of consistency, we refer to the woman the Defendant called as his aunt.

any "influence" in his decision to make a statement to police. The Defendant stated that he believed that, after he confessed, he would "go[ ] home" within six months. He explained his belief that he would go home after a short period of time as follows:

> Because I wasn't there. I believe in the justice system and in the justice system it states that you have a reasonable doubt or - - you got to basically prove that I done something and I know for certain you would not be able to prove that to anything.

The Defendant said that he lied to police and "made up" his involvement in these crimes in an attempt to protect his brother.

The trial court and the parties discussed the poor sound of the recording on the courtroom equipment, so the trial court listened to the video recording of the March 17, 2011 interview on the court's computer after the hearing. The following day the parties again met, and the trial court stated that it had listened to the entire interview. The trial court stated:

> I don't think in over 30 years of being in this business I've ever seen a more voluntary intelligent knowing waiver and statement made by a defendant in any criminal case, much less a murder case. There was nothing done by the officers to either threaten, intimidate, coerce, anything that would even nearly approach overbearing the will of the defendant in this case.

The trial court denied the Defendant's motion to suppress, and the case proceeded to trial.

**B. Trial**

The parties presented the following evidence at the Defendant's trial: Cynthia Moore testified that she and the victim had been neighbors for twenty years. She said that the victim would sometimes join her when she and a friend would walk around the neighborhood.

Ms. Moore recalled the evening of October 12, 2010, saying that she and her friend were on their third lap walking around the block when she noticed that the victim had arrived home at approximately 9:30 p.m. She and her friend walked up to the victim's house where they normally talked with the victim in the evenings, but, on this night, Ms. Moore said the victim "really wasn't talking to us." Ms. Moore said she remained at the victim's home for only about fifteen minutes. She explained the short visit saying that she left "because he was totally acting like he was doing something else, which was out of character."

4

Ms. Moore testified that the victim's porch light was illuminated and that he normally kept his doors and windows open. She described the weather that evening as "pleasant." After she finished walking and had returned to her home, Ms. Moore remained concerned about the victim because of his "very weird" behavior that night. She sent him a text message to ask if he was alright, and he responded that he was "okay." Ms. Moore said that this was her last contact with the victim.

On cross-examination, Ms. Moore testified that, when she stopped by the victim's house that night and while standing on the porch, she observed two "McFlurries" inside the house on the counter. One was located at "one end of the bar" and the other one was directly in front of where the victim was seated. She said the victim was "shoveling" the ice cream into his mouth. She thought this odd and commented to him, "[W]hat's the point in you walking with us every night, if you're going to sit there and eat all that ice cream." To which the victim responded, "I would sure hate to know that if I died tonight, that I wouldn't get to eat my favorite food." Ms. Moore stated that she thought the manner in which the victim was eating the ice cream, and his response to her, were "odd." Ms. Moore stated that she and her friend did not go inside the victim's house that night but remained on the porch.

Robert Guye, III, the victim's son, testified that the victim had owned a .38 revolver with a wood handle and that the victim "always kept ammunition" for the gun in the house. He said that the gun was a "six-shooter" and that he and the victim used to fire it together. He confirmed that, after the incident on October 12, this gun and a video camera were missing from the victim's home. Mr. Guye identified a gun that looked like the victim's missing gun.

Daniel Anderson, an Ashland City police officer, testified that, on the morning of October 13, 2010, he was dispatched to the victim's residence on Jefferson Street. When he arrived, the victim's sister-in-law, Dorian Bruce, was standing across the street. Ms. Bruce told Officer Anderson that she had been asked to "check on" the victim. She said she walked up to the front door, "saw part of the victim," stepped off of the porch, and called 911. After speaking with Ms. Bruce, Officer Anderson proceeded to the front door of the residence and announced a police presence before entering the house. Officer Anderson said that the front door of the house was open and that the storm door was closed.

Officer Anderson testified that the area in which he found the victim was "in disarray." He said that the refrigerator had been moved and that blood was throughout the house. Officer Anderson described the scene as "pretty gory." Upon seeing the victim and the amount of blood, Officer Anderson left the house and waited for back-up officers. The officers then cleared the house and property, secured the scene, and waited for further assistance.

5

Officer Anderson testified that, after securing the scene, he entered the house from the side door in the carport area. He said that this door was "propped opened." He estimated that the door was opened "a couple of feet."

Johnny Hunter, an Ashland City Police Department officer, testified that he reported to the crime scene on October 13, 2010. At the scene, he took pictures of the inside and the outside of the victim's house and a vehicle. In addition to photographing the scene, Officer Hunter said that he helped collect evidence, process the scene for latent fingerprints, and collect blood samples.

Officer Hunter identified photographs taken at the scene that included a photograph of a bloody shoe impression that was found on the front porch of the victim's home. Officer Hunter testified that bloody shoe prints were also found in the dining room and the living room of the house. Police officers cut the flooring in four locations where the shoe prints were found inside the house and collected the flooring as evidence. Officer Hunter said that two of the shoe prints were "no good at all," but the other two samples were sent to a lab for impressions.

Officer Hunter testified that a nine millimeter shell casing was found in close proximity to where the victim was lying on the floor. Officer Hunter identified a photograph of a bullet that was found in the left side of the kitchen sink. The shell casing and bullet were both collected and sent to a lab at the Tennessee Bureau of Investigation ("TBI") for analysis. In front of the sink, a "rear sight" of a weapon was found lying on the carpet. Officer Hunter said that a rear sight would have been removed from the weapon by "force."

Officer Hunter testified about the state of the two bedrooms in the home. He said that the "south bedroom" in the home had "dresser drawers and debris that's been pulled out of them, and turned over, and spilled." He identified a box of .38 special ammunition found in a night stand in the south bedroom. The north bedroom had a "computer area," and the computer had been overturned onto the floor. This room also appeared to have been ransacked.

Officer Hunter testified that a cellular telephone, later determined to be the victim's, was found nearby on the corner of Jefferson Street.

Wanita Hubbard testified that she worked at Copperstone Village Apartments in Nashville, Tennessee as the groundskeeper. She said that between 6:30 a.m. and 7:00 a.m. on October 13, 2010, she was cleaning the parking lot of the apartment complex. She opened the full dumpster to throw away trash she had collected, and a driver's license for "Robert Guy, Junior" fell out. Ms. Hubbard said that she gave the driver's license to her

6

supervisor, Ollie Lunden. Ms. Hubbard said that she also advised her supervisor that she had seen other items in the dumpster that appeared to have "c[o]me out of a billfold."

Ollie Lunden, a manager for Copperstone Village Apartments, testified that on October 13, 2010, Ms. Hubbard worked for the apartment complex as a groundskeeper. One of Ms. Hubbard's duties was to clean the parking lot. On that particular morning, Ms. Hubbard brought Ms. Lunden a driver's license, a True Value Hardware card, and "some other cards" she had found while cleaning the parking lot.

Ms. Lunden testified that she "googled" the address on the driver's license and called the telephone number associated with the address. A man answered the telephone, and Ms. Lunden introduced herself and explained that she had the driver's license and other cards. She offered to either meet in Ashland City to return the cards or mail the cards. The man on the telephone said, "Okay," and hung up. Later, Ms. Lunden received a telephone call from a female asking what items were found. After these telephone calls, a TBI agent came to the property, collected the items Ms. Hubbard had found, and "t[ook] control of the dumpster."

Ms. Lunden testified that the waste disposal service collected garbage from the receptacles at the apartment complex on Wednesdays between 10:00 a.m. and 11:00 a.m.

Patrick Looney, a TBI special agent, testified that he reported to Copperstone Village Apartments between 9:00 a.m. and 10:00 a.m. on the morning of October 13, 2010. Agent Looney identified a photograph of two dumpsters that he crawled inside of and searched for evidence. He said that the dumpsters he searched were located between apartment buildings "A" and "B." He explained that when he first arrived at the complex he spoke with the apartment complex manager. The manager told him that an employee, Ms. Hubbard, had found a driver's license inside the dumpster.

After speaking with the manager, Agent Looney requested another agent be sent to the location for assistance and blocked off the dumpsters from use. Once assistance arrived, Agent Looney put on protective gear and crawled into the dumpster to search for evidence. Agent Looney identified the following items that he had retrieved from the dumpster and from the manager: a Trojan condom, an Eddy Murphy tape, a brown wallet, an Advance Financial card, a Region's Visa card, the driver's license of Robert Guy, a Cheatham County Voter Registration card, a True Care HMO card naming Laura Guy, a United Healthcare card, a police officer's business card, and a Tractor Supply business card. Agent Looney also identified "some kind of address card with phone numbers" that contained the following names: Norma Guye, Sharon Sullivan, Robert Guye, Senior, and Shirley Guye. Agent Looney identified a blue bandanna that he recovered from the dumpster. Agent Looney said that he also collected six pairs of shoes, in varying stages of wear, from the dumpsters. Agent Looney identified a pair of Nike Air Jordans that he had

recovered from the dumpster. These shoes were later sent to a TBI lab for examination. Agent Looney said that he also found in the dumpster a pair of cotton knit gloves that had plastic gloves inside them, which were also sent for examination at the TBI lab.

Nickey Leeper testified that on the night of October 12, 2010, he played in a softball tournament in Ashland City. He parked in a post office parking lot at around 5:45 p.m. and returned to his truck at around 11:00 p.m. When he got back into his truck, he noticed that his GPS was missing. He said that he called police that night but never went to the police station to fill out a report, explaining that "[i]t was [his] fault" because he left the truck doors unlocked. Approximately six months later, the police showed him a GPS, and Mr. Leeper confirmed that it was his GPS. Mr. Leeper testified that he paid approximately $375 for the GPS but agreed that the "fair market value" of the GPS at the time of trial was approximately "two hundred or something."

Joe Craig, a TBI special agent, testified about the progression of the investigation in this case. He stated that, based on the location of the apartment complex where the contents of the victim's wallet were found, he focused his investigation on the East Nashville or North Nashville area. Agent Craig learned that the Ashland City Police Department had collected some videotapes from the victim's residence. One of the video tapes showed an unknown black female who appeared to be five feet, four inches tall and in her early twenties. An image was generated from the video footage and shown to the management of Copperstone Village Apartments, and the female was identified as a resident of the apartment complex, Joycean Harrison. Joycean Harrison lived in building B with her sister, Tavaigner Harrison. Agent Craig spoke with Joycean Harrison who provided nothing "significant" in the way of the investigation.

Agent Craig later developed Timothy Short as a possible suspect. Mr. Short lived in the Copperstone Village Apartments, building A. Agent Craig said that Mr. Short's building was "directly across" from the building in which the Harrison sisters lived. The dumpsters where the victim's personal effects were found were located between these two buildings. Agent Craig said that he spoke with Mr. Short on October 20, 2010, and obtained consent to search the apartment. During the search, Detective Nelson found a CalTech-9 gun with a missing rear sight. The gun was sent to the TBI crime lab for testing, and the gun was confirmed to be the gun that fired the cartridge found at the victim's residence.

Agent Craig testified that he arrested Mr. Short for first degree murder. Mr. Short told Agent Craig about cameras he had bought from Tavaigner Harrison, which included a Pentax 35 millimeter camera. Police later recovered the cameras from Mr. Short's apartment and confirmed that the cameras were the victim's.

Agent Craig testified that, based on information from Joycean Harrison, he located Montario Ostine, the Defendant's brother. Agent Craig said that, at this time, Mr. Short was in custody for a first degree murder charge, and Joycean Harrison was in custody on a prostitution charge for having had sex with the victim for $50. Agent Craig explained that, although Mr. Short was in custody, he still did not feel "completely comfortable" that the evidence was consistent with Mr. Short's involvement in the homicide, so he met with Montario Ostine in the parking lot of Vanderbilt Hospital, Montario Ostine's place of employment, for a "quick interview." After meeting with Montario Ostine, Agent Craig received additional information indicating that Montario Ostine and the Defendant were involved in these offenses. Agent Craig said that his investigation then began to focus on the Ostine brothers. Agent Craig obtained a search warrant for Montario Ostine's car, but recovered nothing.

Agent Craig testified that, in December 2010, he interviewed both Montario Ostine and the Defendant and that both men denied any knowledge of the robbery and shooting. On February 14, 2011, Agent Craig interviewed Tavaigner Harrison at the Williamson County jail in the presence of her attorney. Tavaigner Harrison gave a full statement about the offenses. Agent Craig said that he did not seek an arrest warrant for Montario Ostine or the Defendant at that time because he first wanted to develop more physical evidence against Montario Ostine and the Defendant. He said that, on March 14, 2011, he obtained a second search warrant for Montario Ostine's car. Agent Craig said that, at that time, he also conducted a "follow-up interview" with Montario Ostine. Based on the information learned during the interview, Agent Craig charged Montario Ostine with first degree murder and obtained a warrant for the Defendant. Police officers arrested the Defendant the following day, and he gave a confession to police.

Agent Craig testified that Mr. Short remained in custody after the Defendant's arrest. Agent Craig explained that his investigation revealed that Mr. Short had provided the weapon to Tavaigner Harrison and that she had transferred the weapon to the Ostine brothers. Agent Craig said that Mr. Short pled guilty to facilitation of aggravated robbery and Tavaigner Harrison pled guilty to facilitation of first degree murder for their roles in these offenses.

Agent Craig testified that he obtained DNA samples from the Defendant, Montario Ostine, Mr. Short, Tavaigner Harrison, and Joycean Harrison, which were submitted to the TBI for DNA comparison. Agent Craig said that a partial palm print taken from one of the latex gloves found in the dumpster was matched to Montario Ostine.

Timothy Short testified that, on or about October 12, 2010, Tavaigner Harrison and "two other guys," Montario Ostine and the Defendant, came to his apartment. Tavaigner Harrison asked to borrow one of Mr. Short's pistols. Mr. Short said that he had four or five pistols at the time. He retrieved one of his guns and gave it to Tavaigner Harrison,

who returned the gun to him the following day. Mr. Short said that Tavaigner Harrison never indicated why she wanted to borrow the pistol. When Tavaigner Harrison returned the pistol, Mr. Short bought "a couple of cameras" from her for "thirty dollars or something."

` Mr. Short identified in court the CalTech-9 that he loaned to Tavaigner Harrison in October 2010. Mr. Short denied any involvement in the murder of the victim. He said that he had never been to Ashland City and did not know the victim. Mr. Short agreed that he pled guilty to facilitation of aggravated robbery for giving Tavaigner Harrison the gun used in these offenses. He was sentenced to four years, suspended to time served.

On cross-examination, Mr. Short testified that he believed that Tavaigner Harrison wanted the gun for protection. He stated that Tavaigner Harrison "passed" the gun to the Ostine brothers. Mr. Short said that, when Tavaigner Harrison returned the gun to him, he did not ask about what she had done with the gun.

Tavaigner Harrison testified that in October 2010, she lived at Copperstone Village Apartments with her sister, Joycean Harrison. Tavaigner Harrison said that she met the victim through a friend. About her relationship to the victim, she stated, "we really just acquainted (sic.) but had talked about having like a sugar-daddy-type relationship." Tavaigner Harrison agreed that she had been to the victim's home in Ashland City. She said that she was aware that her sister, Joycean Harrison, had also "gone out" with the victim. She explained that relationship, saying "[The victim] came and got [Joycean Harrison] one night and that was the end of it."

Tavaigner Harrison testified that, several days before the shooting, Montario Ostine and the Defendant raised the idea of "getting a lick," or robbing someone. Tavaigner Harrison explained that Montario Ostine was her brother's best friend and like a brother to her. She said that she had more recently met the Defendant but that "he was cool." When the idea of robbing someone was raised, Tavaigner Harrison suggested the victim because he had told her he would be out of town on business. Taviagner Harrison said she went to Mr. Short, a neighbor she had met when she moved into the apartment complex, to borrow a gun. Tavaigner Harrison recalled that she told Mr. Short that her brothers, referring to Montario Ostine and the Defendant, wanted to borrow a gun "to go and run up in this man's house while he wasn't there." Tavaigner Harrison explained that she told Mr. Short that Montario Ostine and the Defendant were her brothers because she believed that, if he knew they were her friends, he might not loan the gun.

Tavaigner Harrison testified that, since the victim would not be at home, she believed the purpose of the gun was to "make them be a little bit more bold." She said that she did not believe that the Ostine brothers would hurt anyone. Tavaigner Harrison said that at around 5:30 p.m. or 6:00 p.m. on October 12, 2010, Montario Ostine drove her

and the Defendant to the victim's home. She initially had difficulty recalling where the victim lived, and they drove past Ashland City. She instructed Montario Ostine to turn the car around, and they returned, eventually finding the victim's home. She said they drove by the victim's home, and she saw that he was home. She said "two young white women" were also there. Montario Ostine drove past the house three or four times before driving to a nearby post office where Tavaigner Harrison looked for a bathroom. When she returned to the car, the Defendant stated that he was going to try and take a GPS that was in a white truck parked next to them. The Defendant got out of the car and opened the unlocked passenger door of the white truck and took the GPS, which was later sold to Mr. Short.

Tavaigner Harrison testified that they returned to the victim's home "some time after ten." Montario Ostine parked a short distance from the victim's home on Water Street. She recalled that one of the brothers put a bandana on to cover his face and that the other put on a "stocking cap that you can pull [ ] over your whole face." The two men got out of the car and walked to the victim's house while Tavaigner Harrison waited in the car. Tavaigner Harrison recalled that the two men were inside the victim's house "a minute or two" before she heard "like this pow." Approximately a minute later, the two men came running back to the car. Montario Ostine threw "a whole lot of stuff" in the back seat where she was seated, and then he drove away. Tavaigner Harrison said that she looked in the bag that Montario Ostine threw in the car, and she remembered seeing "a couple of cameras" and a pistol. She said the pistol was not the one she had borrowed from Mr. Short.

Tavaigner Harrison testified that she told Montario Ostine and the Defendant that she heard the gun go off and asked the Defendant if he had shot the victim. The Defendant said, "[Y]es." When she asked why, the Defendant said he had told the victim to "be still," and the victim had "kept moving." Tavaigner Harrison said that she asked the Defendant where he shot the victim, and the Defendant said he shot the victim in the back of his head. On the drive back to Nashville, Montario Ostine stopped at a convenience store. She said that she did not know that the Defendant and Montario Ostine had taken the victim's wallet until "[they] were pulling in the gates of [her] apartment." Once inside her apartment, they sorted through the victim's belongings. The Defendant told her to cut up the victim's credit cards, and she did so. The Defendant also gave her Mr. Short's gun, and she returned it to Mr. Short the following day. Other than the items she sold to Mr. Short, she was unaware of where or how the other stolen items were disposed of.

Tavaigner Harrison testified that, on the night of the robbery and shooting, the Defendant wore dark clothing. She said that Montario Ostine had a box of latex gloves. While in the parking lot of the post office, she observed the two men put on latex gloves. She said that "one of" the men also had a pair of black knit gloves.

11

Tavaigner Harrison testified that after her sister, Joycean Harrison, was arrested in connection with these crimes, she called Montario Ostine and told him about the arrest and that she would not allow her sister to "suffer for what we did." A short time later, the Defendant called Tavaigner Harrison, and she related the same information to him. He told her not "to say anything that if [she] said anything that somebody wasn't going to walk free." She said that the Defendant was not referencing jail in this statement, and she felt threatened.

Tavaigner Harrison testified that, for her role in these crimes, she had been convicted of facilitation to commit first degree murder and that she had received a fifteen-year sentence.

On cross-examination, Tavaigner Harrison confirmed that she had expected to benefit from the proceeds of the robbery. She said that she could not recall what shoes the Defendant wore the night of the robbery and shooting. She agreed that she told the police in her statement that the Defendant wore "Timberline" boots but maintained that she could not, at the time of the trial, recall the shoes he wore that night. Tavaigner Harrison said that the night of the robbery she knew the victim was dead. She denied putting any of the stolen items in the apartment complex dumpster. She testified that she told Mr. Short that his gun had been used to shoot the victim when she returned the gun to him.

Terry Arnie, a TBI special agent forensic scientist, testified as an expert in the field of firearms identification. Agent Arnie examined a CalTech-9 semi-automatic pistol, the cartridge found in the victim's home and the bullet found in the victim's kitchen sink. Agent Arnie conducted a comparison test and determined that the cartridge case had been fired from the CalTech-9 semi-automatic pistol. As to the bullet found in the victim's kitchen sink, Agent Arnie stated that:

It was a fragment and fairly, badly damaged.

I could tell that it was the correct caliber. It had the same class characteristics, in that the land impressions were the same widths, but many manufacturers use that type of likening pattern.

The individual characteristics were not plain enough for me to be able to make an identification.

Agent Arnie testified that the police also submitted a rear gun sight for examination. Based upon his examination, Agent Arnie stated that the rear sight found in the victim's home appeared to be consistent with a rear sight from a Caltech-9. Agent Arnie confirmed that all Caltech-9 guns have a rear sight.

12

Linda Littlejohn, a TBI forensic scientist, testified as an expert witness in the field of forensic science. Agent Littlejohn compared a partial shoe print found on the wood floor of the victim's home with a pair of Air Jordan shoes. Agent Littlejohn stated that the partial shoe print was consistent with the size, shape and tread design of the right Air Jordan and, therefore, the print "could have been made" by the Air Jordan shoe. Due to the lack of individual characters, however, she was unable to conduct a more conclusive analysis.

Jennifer Shipman, a TBI forensic scientist, testified as an expert witness in the field of serology and DNA. Agent Shipman stated that a DNA profile was developed from blood found on the slide, magazine release, and barrel of the gun associated with this case. She said that the profile matched the DNA standard for the victim. Agent Shipman also analyzed a pair of knit gloves on which she found the presence of blood. The DNA profile from the blood was matched to the DNA standard for the victim. The inside of the knit glove presented the presence of human DNA, and the Defendant could not be excluded as the minor contributor of the profile. Agent Shipman confirmed that she did exclude Montario Ostine, Tavaigner Harrison, Mr. Short, and Joycean Harrison as the minor contributor of the profile found inside the knit glove.

Agent Shipman testified that she analyzed a pair of shoes related to the case. DNA material was found on the inside and the outside of the shoe. A partial profile was obtained from the outside of the shoe that matched the victim's DNA standard. The DNA profile from the inside of the shoe was consistent with a mixture of genetic material from at least two individuals, and the Defendant could not be excluded as a contributor to the material.

Jason Matlock, an Ashland City police department officer, testified that a cellular telephone was found near the crime scene at the corner of Water and Jefferson Streets. Officer Matlock said that the police later determined that the cellular telephone belonged to the victim's daughter.

Officer Matlock testified that he conducted an interview on March 17, 2011, with the Defendant at the Ashland City Police Department. Deputy Chief Kenneth Ray was also present during the interview. He said that he read the Defendant his rights before video recording the interview. During the interview, the Defendant asked to make a telephone call to a person he referred to as his "Mama," but he later told Officer Matlock it was his "Auntie." Officer Matlock said that he allowed the Defendant to make the call to his aunt, on speaker phone, during the interview. The audio recording of the interview and telephone call were played for the jury.

13

On the video recording of Officer Matlock's interview with the Defendant, Officer Matlock can be heard reading the Defendant his rights. He asked the Defendant if he was willing to talk with the police and the Defendant said that he was. The Defendant signed a waiver of his rights. Officer Matlock told the Defendant what the charges against him were, and gave the Defendant an opportunity to tell the police his "side of the story." The Defendant denied committing the murder. He agreed that he had previously been through Ashland City, but he could not say whether he was in Ashland City on the date at issue. Officer Matlock told the Defendant that the proof showed that he was at the victim's house the night of the victim's murder. Officer Matlock told the Defendant that Montario Ostine and Tavaigner Harrison had both given full confessions. The Defendant was informed that the death penalty was a potential sentence for the crimes and that his cooperation would "make things look better for [him]."

The Defendant asked the officer if he could make a telephone call to his aunt, and the officer agreed. During the telephone call, the Defendant told his aunt that he was going to tell the truth and go to jail. He asked her to take care of his "babies." He told his aunt that he was going to be in jail "for awhile," possibly fifty-one years. He relayed to her that the police had told him if he cooperated that his time would be shortened. He stated that there were no promises. After speaking to his aunt, the Defendant immediately confessed to killing the victim. He stated, "I done it. I done every bit of it. . . . I am the trigger man. I did shoot that man." He explained that he went into the house and "beat the hell out of that man." He said he was terrified that the victim was going to "get out" and tell on him. He told the police that he thought it would all go away if he shot the victim, but that it had not gone away. He expressed remorse for killing the victim and stated that he wished he could take it back. He said Tavaigner Harrison was angry at the victim and convinced the Defendant to go and rob him. The Defendant told the police officers that he did not know about a sex tape involving Tavaigner Harrison's sister until after the incident. The Defendant stated that he participated in the robbery because he needed money.

On the recording, the Defendant told the police that he gave the gun stolen from the victim's house, a .38 revolver, to a man "in the neighborhood." He recounted that he, Montario Ostine, and Tavaigner Harrison drove around in Montario Ostine's car looking for the victim's house. When they found the victim's house, they passed the house three or four times, and there were "two white ladies" at the house. They waited at a nearby ball park where Tavaigner Harrison asked him to steal a GPS from a pick-up truck.

The Defendant told the police that, when the group returned to the victim's house, Montario Ostine parked on a side street. Montario Ostine and the Defendant entered the victim's home through the side door of the house and found the victim seated at an "island" or "bar." The Defendant announced that the victim was being robbed and ordered him to the floor. The victim did not comply with the Defendant's instructions to

14

get on the floor, so the Defendant struck the victim repeatedly and then dragged him into the dining room. He told the victim to stay in the dining room and "let [his] brother do what he needed to do." Once again, the victim did not comply and kept moving. The Defendant said he struck the victim three or four more times with the pistol on the back of the head. When the victim tried to crawl toward the door, the Defendant told the victim if he did not stop, the Defendant would shoot the victim. The victim jumped up, and the Defendant shot him. He said Montario Ostine was "in the back" and had a bag with some "camera stuff" in it. After killing the victim, the Defendant told Montario Ostine that they needed to leave. On the recording, the Defendant told the police that Montario Ostine grabbed a gun and a bag with some change and that the Defendant took the victim's wallet as they were leaving the house.

The Defendant recounted the events following the robbery and shooting. He recalled that the group stopped at a store on the drive back to Nashville. At Travaigner Harrison's apartment, he cleaned Mr. Short's gun and gave Travaigner Harrison the gun to return to Mr. Short. In the recording, he said that he and Montario Ostine both threw items into the apartment complex dumpster. He stated that he threw his shoes and the victim's wallet into the dumpster and later burned his clothing. The Defendant told the officers that there was $40.00 in the victim's wallet, and it was split between "everyone involved." He said Travaigner Harrison had told them the victim would have five to six thousand dollars at the house and many items of value. He told the police that he wore a blue bandana and Montario wore a red bandana. The Defendant said that he wore black clothing and gloves on the night of the robbery.

In the video-recorded interview, the Defendant told police that he, Montario Ostine, and Travaigner Harrison went to Mr. Short's apartment to get the gun before the robbery. He said that Mr. Short gave either Montario Ostine or Tavaigner Harrison the gun. The Defendant recalled that he did not take possession of the gun until they were in the car to go to Ashland City. He said that Travaigner Harrison was unsure of the exact location of the victim's home and that they initially drove past Ashland City. Travaigner Harrison realized they had gone too far, and they turned around and drove back to Ashland City.

Officer Matlock testified that the evidence at the crime scene was consistent with the Defendant's statements about the crimes.

Dr. Adele Lewis, the Deputy Chief Medical Examiner for Davidson County, testified as an expert witness in the field of forensic pathology. Dr. Lewis stated that the victim had four different lacerations due to blunt force trauma to his head. Dr. Lewis identified a photograph of one of the lacerations on the back of the victim's head and opined that, based on his injuries, the victim was likely hit five times on the head. Dr. Lewis noted that she found multiple injuries on the victim that were consistent with defensive wounds. Dr. Lewis identified a picture of the victim's right hand that depicted

15

some bruises and scrapes to the thumb and the "thumb side of the hand." Dr. Lewis said that the injuries to the victim's hand were consistent with forceful contact with a gun sight on a pistol. There was a gunshot entrance wound on the back of the victim's head, and the exit wound was over the victim's right eye. Dr. Lewis explained that the victim had "black-eyes," which are caused by a skull fracture. Dr. Lewis testified that the cause of death was blunt force injuries and a gunshot wound to the head.

On cross-examination Dr. Lewis noted that the symmetrical wounds on the victim were consistent with being hit with a pistol.

The Defendant testified that he did not kill the victim and was not in Ashland City on the night the victim was killed. The Defendant denied placing any items in a dumpster at the apartment complex. The Defendant acknowledged his videotaped confession but explained that he lied to the police to protect Montario Ostine. He said that, at the time of the confession, he was concerned about a possible death sentence or life sentence for himself and his brother.

On cross-examination, the Defendant stated that on the night of these crimes he was at his sister's apartment complex until about 11:30 p.m. and then he went to "Sammy's house."

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder, first degree felony murder, and aggravated robbery. The trial court merged the murder convictions and imposed a life sentence and a concurrent sentence of twelve years for the aggravated robbery conviction. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant asserts that: (1) the evidence is insufficient to support his convictions; (2) the trial court erred when it denied his motion to suppress his statements to police as involuntary statements; and (3) the State engaged in prosecutorial misconduct during closing argument.

### A. Motion to Suppress

The Defendant asserts that the trial court erred when it denied his motion to suppress his statements to the police. The Defendant contends that, because the statements were involuntary and the result of police coercion, the trial court should have suppressed the statements. The State responds that the trial court properly denied the Defendant's motion to suppress, finding that the Defendant's statements were voluntarily made after he was advised of the *Miranda* rights. We agree with the State.

16

After hearing the evidence at the suppression hearing, the trial court made the following findings:

> I don't think in over 30 years of being in this business I've ever seen a more voluntary intelligent knowing waiver and statement made by a defendant in any criminal case, much less a murder case. There was nothing done by the officers to either threaten, intimidate, coerce, anything that would even nearly approach overbearing the will of the defendant in this case.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution protect a defendant from compelled self-incrimination. *Miranda v. Arizona* bars the admission of any statements elicited from a defendant through police initiated custodial interrogation unless the defendant, prior to making the statement, was warned of certain constitutional rights and knowingly waived those rights. 384 U.S. 436, 444 (1966). These procedural safeguards require that police officers advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn.2005). If the suspect indicates in any manner that he wishes to remain silent, custodial interrogation must cease. *State v. Huskey*, 177 S.W.3d 868, 878 (Tenn. Crim. App. 2005).

Our review of the recorded interview shows that the Defendant was issued *Miranda* warnings. He confirmed that he knew and understood his rights and signed a waiver indicating such. After the Defendant was informed of his rights, Officer Matlock asked

the Defendant if he was willing to speak with the police, and the Defendant responded that he was. Officer Matlock informed the Defendant of the charges against him and that Montario Ostine and Tavaigner Harrison had already confessed. The investigators informed the Defendant that the murder charge he was facing was subject to a life sentence or the death penalty. They told the Defendant that the district attorney determined the appropriate charges and that the Defendant's cooperation and honesty would be conveyed to the district attorney. The Defendant asked to call his aunt, and Officer Matlock accommodated the request. During the telephone conversation, the Defendant told his aunt that he might serve a lengthy sentence. He further stated that his cooperation might shorten his sentences, but there were "no promises." After ending the telephone conversation with his aunt, the Defendant gave a full confession, consistent with the evidence in the case, to the police. The Defendant was polite and courteous throughout the interview and answered all questions asked.

The evidence does not preponderate against the trial court's finding that the Defendant voluntarily gave his statement to police. Detective Matlock advised the Defendant of his rights. The Defendant expressed his willingness to speak with police, and nothing in his statement or demeanor indicates otherwise. The investigators made no threats nor did they act in an intimidating manner during the interview. When informing the Defendant of the charges he faced, a possible punishment of the death penalty was mentioned. The detectives' mention of possible punishments for an offense alone, however, is not sufficient to prove coercion in this case. *See State v. Morgan*, 825 S.W.2d 113, 116 (Tenn. Crim. App. 1991) (finding that the defendant had failed to show that his statement was coerced when the investigators had discussed the death penalty with him). Accordingly, we conclude that the trial court properly denied the Defendant's motion to suppress his statements to the police. The Defendant is not entitled to relief as to this issue.

## B. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to sustain his convictions for first degree premeditated murder, first degree felony murder, and aggravated robbery. Specifically, the Defendant contends that the evidence did not establish that he was in the victim's home on the night of the robbery and shooting. The State counters that sufficient evidence was presented from which a reasonable juror could conclude that the Defendant committed each of the crimes for which he was convicted. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*,

18

91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *See also Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. First Degree Murder

In this case, the jury convicted the Defendant of first degree premeditated murder and first degree felony murder. The trial court merged the two convictions; however, the Defendant challenges both convictions on appeal. First degree premeditated murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1)

(2010). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2010). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2010).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy." T.C.A. § 39-13-202(a)(2) (2010). In this case, the Defendant was convicted of first degree felony murder in the perpetration of an aggravated robbery. The mental state required for this conviction was that the Defendant possessed the intent to commit the aggravated robbery, which was the underlying offense.

The evidence, considered in the light most favorable to the State, proves that the victim was at his home in Ashland City on the night of October 12, 2010. On or around this same date, Travaigner Harrison, Montario Ostine, and the Defendant went to Mr. Short's apartment to procure a gun for the purpose of robbing the victim. Travaigner Harrison knew the victim and suggested him to Montario Ostine and the Defendant as a potential victim for the robbery. After procuring a gun from Mr. Short, the three drove to Ashland City. Upon finding the victim's home, they saw that the victim was at home and that two women were also present. Montario Ostine drove to a nearby parking lot where

the group waited for the women to leave the victim's house. While they waited, the Defendant stole Mr. Leeper's GPS from the truck parked next to them. When they returned to the victim's house, Montario Ostine parked his car on a nearby street, and the Defendant and Montario Ostine entered the victim's house dressed in dark clothing and gloves. The Defendant ordered the victim onto the floor. When the victim did not comply, the Defendant repeatedly hit the victim and then dragged him into the dining room. The Defendant instructed the victim to stay still. The victim continued to move, and the Defendant struck the victim an additional three or four times with the gun on the back of the head leaving lacerations on the victim. When the victim attempted to crawl away, the Defendant stated he would shoot the victim if he continued to move and then he shot the victim in the back of the head and killed him. After killing the victim, the men took a bag of the victim's belongings and, as they exited, the Defendant took the victim's wallet. The group returned to Travaigner Harrison's apartment where they sorted through the stolen items, divided the proceeds of the robbery and then the Defendant threw his shoes and the victim's wallet into a dumpster.

We conclude that there is sufficient evidence upon which the jury could conclude that the Defendant committed first degree premeditated murder. The evidence showed that, before driving to Ashland City, the Defendant procured a gun from Mr. Short. The Defendant then entered the unarmed victim's home with the gun and hit the victim repeatedly. The Defendant told the victim that, if he moved, he would shoot him. When the victim still continued to move, the Defendant shot the victim in the back of the head. After returning to Nashville, the Defendant sorted through the stolen items and split the proceeds with Montario Ostine and Travaigner Harrison before disposing of his shoes and the victim's wallet in the dumpster at the apartment complex. This evidence supports the jury's finding that the Defendant intentionally and with premeditation killed the victim.

Further, the evidence supports the jury's finding that the Defendant participated in an aggravated robbery that resulted in the victim's death. The Defendant stated that he needed money and agreed to participate in a robbery of the victim. He went with Travaigner Harrison to procure a gun from Mr. Short that he later used to kill the victim. Montario Ostine and the Defendant entered the victim's house where the Defendant beat the victim and held him at gunpoint while Montario Ostine went through the victim's belongings. When the victim continued to attempt to flee, the Defendant shot the victim in the back of the head to prevent him from fleeing and implicating the Defendant in these crimes. After killing the victim, the Defendant took the victim's wallet and shared in the proceeds of robbery.

21

As to the Defendant's specific contention that the State did not prove his presence at the victim's house on the night of the murder, we do not agree. The Defendant admitted his presence at the victim's house and gave a detailed account of the robbery and murder. The Defendant's account was consistent with the evidence at the crime scene and the evidence gathered during the investigation of these crimes. Travaigner Harrison also gave a statement, consistent with the Defendant's admission to police, placing the Defendant at the victim's home.

Accordingly, we conclude that the evidence is sufficient to support both the convictions for first degree murder beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

## 2. Aggravated Robbery

A conviction for aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and the victim suffered serious bodily injury. T.C.A. §§ 39-13-401(a), -402(a)(2) (2010).

The evidence, considered in the light most favorable to the State, showed that the Defendant rode with Montario Ostine and Travaigner Harrison to Ashland City to rob the victim. The three obtained a gun from Mr. Short to use during the robbery. The Defendant took the gun inside the victim's home and announced that he and Montario Ostine were robbing the victim and ordered the victim to the ground. When the victim did not comply, the Defendant repeatedly hit the victim and then dragged him into the dining room. The Defendant told the victim to stay still while Montario Ostine robbed the victim. When the victim attempted to crawl, the Defendant threatened to shoot the victim if he moved any further. The victim continued to move, and the Defendant shot him in the back of the head, killing him. After killing the victim, the Defendant took the victim's wallet containing $40.00. The Defendant split the $40.00 with Montario Ostine and Travaigner Harrison and then threw the victim's wallet into a dumpster.

22

Accordingly, we conclude that the evidence is sufficient to support the conviction for aggravated robbery beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue

## C. Prosecutorial Misconduct

The Defendant contends that the prosecutor engaged in misconduct during closing arguments. He asserts that the prosecutor made a comment about the Defendant's race in an effort to inflame the jury. The State counters that the Defendant has waived this issue by failing to make a contemporaneous objection at trial. The State further contends that the Defendant has failed to show that the prosecutor's statement affected the outcome of the trial.

The Defendant failed to object at the trial to the prosecutor's statement. Typically, when a prosecutor's statement is not the subject of a contemporaneous objection, the issue is waived. Tenn. R. Crim. P. 33 and 36(a); *see also State v. Thornton*, 10 S .W.3d 229, 234 (Tenn. Crim. App. 1999); *State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that the failure to object to the prosecutor's alleged misconduct during closing argument waived later complaint). The Defendant raised this issue in his motion for new trial, and the trial court addressed the issue on its merits. Accordingly, we will also review the issue on its merits.

Recently, our Supreme Court, in *State v. Jackson*, 444 S.W.3d 554, 590 (Tenn. 2014), addressed standards for review of errors in the context of improper prosecutorial argument and the importance of identifying the category of error to determine the standard. Our review must begin with identifying the category of error: (1) structural constitutional error; (2) non-structural constitutional error; or (3) non-constitutional error. The category of error will then guide our review of the error. Structural constitutional error requires automatic reversal. *Id.* Non-structural constitutional errors and non-constitutional errors, however, do not require mandatory reversal. *Id.* For non-structural constitutional error, the State bears the burden of demonstrating that the error is harmless beyond a reasonable doubt. *Id.* at 591 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). Non-constitutional errors require the defendant to establish "that the error 'more probably than not affected the judgment or would result in prejudice to the judicial

23

process.'" *Id.* (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). In our view, the error alleged in this case is a non-constitutional error.

In general, the scope of opening and closing arguments is subject to the trial court's discretion. Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). Argument, however, must be temperate, "predicated on evidence introduced during the trial," and relevant to the issues being tried. *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994). Thus, the State must not engage in argument designed to inflame the jurors and should restrict its comments to matters properly in evidence at trial. *State v. Hall*, 976 S.W.2d 121, 158 (Tenn. 1998).

In *State v. Goltz*, this Court set out the following five recognized areas of prosecutorial misconduct related to argument of counsel:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7-106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

When a reviewing court finds improper prosecutorial argument that does not rise to the level of a constitutional violation, five factors should be considered to determine whether a prosecutor's improper conduct could have affected the verdict to the "prejudice of the defendant." *State v. Philpott*, 882 S.W.2d 394, 408 (Tenn. Crim. App. 1994). The factors are: (1) the conduct complained of in light of the facts and circumstances of the case; (2) the curative measures undertaken; (3) the intent of the prosecutor in making the improper remarks; (4) the cumulative effect of the improper conduct and any other errors in the record; and, (5) the relative strength or weakness of the case. *Id*. (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5.

The Defendant specifically attacks the following statement made during closing argument:

"And [the victim] was in his home and he just wanted to live, folks. He just wanted to live. He just kept struggling to live. Sounds like he couldn't trust the black guy from Nashville to let him live."

The Defendant raised this issue in the motion for new trial, and the trial court found that this statement was "uncalled for" and "never should have been made," but concluded that the statement did not affect the verdict. The trial court noted that the Defendant's failure to object during closing argument prevented the trial court from giving a curative instruction to the jury.

In considering the five recognized areas of prosecutorial misconduct set forth in *Goltz*, we conclude that the prosecutor's comment in this case violated the standard prohibiting argument offered to intentionally inflame the jury. We agree with the trial court's finding that the prosecutor's statement about the Defendant's race was both unnecessary and irrelevant. Furthermore, any reference by the prosecutor to the Defendant's race for the purpose of inflaming the jury was improper.

25

When evaluating an improper prosecutorial argument we are to consider "whether the improper conduct could have affected the verdict to the prejudice of the defendant." *Harrington v. State*, 385 S.W.2d 758, 759 (1965). In light of the *Judge* factors, we cannot conclude that the comment affected the verdict. The reference to the Defendant's race was isolated in the context of the entire closing argument, and the State's case against the Defendant was overwhelming. As the trial court noted, no curative measures were taken because the Defendant lodged no objection. Based upon the strength of the evidence at trial, we cannot conclude that the prosecutor's statement referencing the Defendant as "the black guy from Nashville" affected the jury's verdict.

Accordingly, we conclude that the improper conduct complained of did not affect the jury's verdict to the prejudice of the Defendant. The Defendant is not entitled to relief as to this issue.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____

ROBERT W. WEDEMEYER, JUDGE